# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

NITA J. METTS,

Plaintiff,

-vs-                                                          Case No.  6:05-cv-5-Orl-JGG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,

Defendant.

_____

# MEMORANDUM OF DECISION

Plaintiff Nina Metts ["Metts"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for a period of disability and disability insurance benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I.   PROCEDURAL HISTORY

On December 26, 2001, Metts filed a claim for disability insurance benefits and supplemental security income benefits, claiming disability as of October 6, 2000 due to pain in her neck, back, shoulders, arms, and right hip, weakness in both arms, numbness in her hands, and depression.  R. 59.  Her claims were denied initially, R. 53, and also upon reconsideration, R. 49.  On January 26, 2004, the Honorable Franklin D. Holder, Administrative Law Judge ["ALJ"], held a fifteen-minute hearing on Metts' claim in Orlando, Florida.  R. 358-86.  Attorney Kathleen Smith represented Metts at the hearing.  R. 358.  The ALJ heard testimony from Metts.  R. 359.

On February 24, 2004, the ALJ issued a decision that Metts was not disabled and not entitled to benefits.  R. 31-32.  Following a review of the medical and other record evidence, the ALJ found that Metts could not perform her past relevant work as a department manager, service desk clerk, and pantry manager at K-Mart.  R. 29, 31, Finding 7.  The ALJ found that Metts nevertheless retained the residual functional capacity ["RFC"] to perform substantially all of the full range of the physical exertional requirements of sedentary work.  R. 31, Finding 11.  The ALJ found that Metts had occasional postural limitations, but could lift ten pounds, stand and walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday.  *Id.*, Finding 6.  Applying the Medical-Vocational Guidelines, the ALJ concluded that Metts was not disabled.[1]  R. 32, Finding 12.

The Appeals Council denied review.  R. 4.  On January 3, 2005, Metts timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1 at 2-3.  On August 18, 2005, Metts filed in this Court a memorandum of law in support of her appeal.  Docket No. 13.  On October 25, 2005, the Commissioner filed a memorandum in support of her decision that Metts was not disabled.  Docket No. 16.  The appeal is ripe for determination.

## II.   THE PARTIES' POSITIONS

Metts assigns two errors to the Commissioner.  First, Metts claims that the Commissioner erred in determining that Metts could perform the full range of sedentary work, and therefore, in applying the Medical Vocational Guidelines directed a finding of "nondisabled."  Docket No. 13 at 6-9.

---

[1]The Social Security ALJs face a herculean task.  The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals.  With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases.  The effects are felt in the district court.  According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation.  Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

Second, Metts argues that the Commissioner erred by failing to accord proper weight to the opinion of Dr. Stanley Golovac, Metts' treating physician. *Id.* at 9-14.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that, because the Commissioner correctly determined that Metts could perform the full range of sedentary work, application of the Medical Vocational Guidelines was correct. Docket No. 16-1 at 5-8. Second, the Commissioner counters that the Commissioner properly discounted Dr. Golovac's opinion. *Id.* at 10.

### III.    **THE STANDARD OF REVIEW**

#### A.    **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable

as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.     REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.  42 U.S.C. § 405(g)(Sentence Four).  The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).  A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

## C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a

sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988);  *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[2]  *Id.*

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

**IV.**     **THE LAW**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

**A.**     **DEVELOPING THE RECORD**

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### B.     THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985

F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether a claimant can perform past relevant work despite his or her impairment.  20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.  *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant.  *See* SSR 82-61.  If so, the claimant is not disabled.  If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy.  SSR  82-61.  In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or  her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c).  If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite

the claimant's disability.  *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).  Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations

are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.   TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the

accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or

the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.    PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1529. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*,

-13-

957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

G.      MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

H.      THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

-15-

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity. The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment. Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work). A "marked" degree of limitation means more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living;  social

-16-

functioning;  concentration, persistence and pace;  or ability to tolerate increased mental demands (stress).  This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms would indicate. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The results of a single examination may not adequately describe these individuals' sustained ability to function. It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1. It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1. While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of

-18-

impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

## V.   APPLICATION AND ANALYSIS

### A.   THE FACTS

Metts was born on June 1, 1956, and was forty-seven years-old on the day of the ALJ's hearing on January 26, 2004.  R. 361.  She attended school until tenth grade.  R. 103.  She has worked for K-Mart as a  department manager, service desk clerk, and pantry manager, and has also worked as a gas station attendant and a parts deliverer.  R. 88.  Metts has not engaged in any substantial gainful activity since October 6, 2000, the alleged onset date of her disability.  R. 31, Finding 2.

Metts reports being injured initially in 1996 when a case of detergent fell off a shelf at work, and hit her head.  R. 195.  In 1998, she was injured again while moving furniture at work.  *Id.*  On October 1, 1999, Metts saw Dr. J. E. Rojas with complaints of pain in her upper back, shoulder, right buttock, and feet.  R. 136.  She stated that she was "pulling and twisting" at work on August 15, 1999 when she injured her back and shoulders.  *Id.*  Dr. Rojas diagnosed back and neck sprain.  R. 138.  Dr. Rojas' physical examination revealed some spasms and tenderness in her cervical and some spasms in her lumbar spine.  R. 137.  She showed some loss of motion in both her cervical and lumbar spine. *Id.*  She had full range of motion in her upper extremities.  R. 138.  X-rays of her lumbosacral spine were normal except for the presence of a traction spur at L4.  *Id.*  X-rays of her cervical spine and bilateral shoulders were normal.  *Id.*  Dr. Rojas started Metts on physical therapy and medication.  *Id.* Metts went to a follow-up appointment with Dr. Rojas on November 8, 1999.  R. 135.  He examined

her lumbar spine and noted that spasms were present.  *Id.*  He diagnosed neck and back sprain, and prescribed Flexeril and Vicodin.  *Id.*  Metts continued to see Dr. Rojas who diagnosed possible carpal tunnel and some spinal stenosis.  R. 134.  According to Dr. Rojas' notes, Metts was "working" on January 24, 2000 and March 24, 2000.  *Id.*

On March 15, 2000, upon referral from Dr. Rojas, Metts saw Dr. Antonio Rivera for an electrodiagnostic evaluation.  R. 288.  Electromyographies (EMG's) and nerve conduction studies (NCS's) showed mainly normal results.  R. 288-89.  Dr. Rivera's impression was that the tests were mainly normal (with no evidence of cervical radiculopathy), except for evidence of mild decreased responses in upper extremities.  R. 289.

On June 21, 2000, Metts visited Dr. Bloom with various complaints of pain.  R. 234.  At that time, Metts was still working part-time at K-mart.  R. 235.  Dr. Bloom's physical examination revealed normal results, except that Metts had "mild point tenderness" throughout her buttocks and her thoracic and lumbar spine.  R. 236.  Otherwise, Dr. Bloom stated that she had adequate motor strength, a normal gait, and no problems with her upper and lower extremities.  *Id.*  Dr. Bloom recommended that Metts receive cervical epidural blocks, physical therapy, and continue taking her medication.  R. 237.  Dr. Bloom treated Metts with epidural blocks on June 26, 2000, and July 3 and 10, 2000.  R. 228-32.  On July 21, 2000, Metts saw Dr. Bloom as a follow-up visit after her epidural blocks, and reported "50% pain relief."  R. 227.  The numbness in her upper extremities and her pain had decreased.  *Id.*  Dr. Bloom noted "significant improvement with cervical epidural blocks, " and recommended physical therapy, education about "proper body posture and mechanics," and anti-inflammatory medication.  *Id.*  Her physical examination was normal, except for limited range of

motion of the cervical spine.  *Id.*  He also noted that she was alert, and observed no signs of cognitive defects.  *Id.*

Metts returned to Dr. Bloom in September 2000, however, and complained of "persistent neck and headache pain despite conservative therapy."  R. 225.  Metts stated that physical therapy exacerbated her pain.  *Id.*  Dr. Bloom's physical examination revealed similar findings as his previous visits.  His impression was cervicalgia, cervical myofascial pain, and intermittent cervical radiculitis.  *Id.*  Dr. Bloom informed Metts that he had no further recommendations, and returned her to the care of Dr. Rojas.  *Id.*  On September 11, 2000, Metts saw Dr. Rojas who diagnosed cervical spinal stenosis.  R. 133.  He offered Metts neck surgery, which she agreed to contemplate.  *Id.*  She was still working at this time.  *Id.*

Dr. Paul M. Keller saw Metts on December 8, 2000 to offer a second opinion for Metts' request for Workers' Compensation.  R. 195.  Metts, again, complained of neck, back, and right upper extremity pain, with pain radiating to her forearm and wrist.  *Id.*  Dr. Keller diagnosed degenerative disc disease in the lumbar spine and cervical radiculopathy.  R. 197.  Dr. Keller noted some tenderness in the paraspinal muscles of the cervical spine and also in the lumbar area.  R. 196.  Metts also had some decreased sensation in her right index finger, right lateral calf, and lateral foot area.  *Id.*  Metts's motor strength was 5/5 for tests of all groups in her upper and lower extremities.  *Id.*  She was able to forward flex her neck thirty degrees, extend it twenty degrees, and laterally rotate it forty degrees in each direction.  She was also able to forward flex her lumbar spine to touch her ankles.  *Id.*  X-rays of her cervical spine taken the day of her visit were normal.  *Id.*  Dr. Keller also noted that x-rays of her lumbar spine dated January 29, 2000 showed degenerative changes L5-S1.  *Id.*  He also reviewed

-21-

an MRI which showed degenerative disc disease L3-L4, L4-5, and L5-S1.  R. 196-97.  An MRI of the

cervical spine from February 28, 2000 showed possible disc herniation and motion artifact that was

severe at C4-C5 down to T1.  R. 197.  Dr. Keller recommended an new MRI scan of the cervical area.

*Id.*

The MRI of Metts' cervical spine, dated December 18, 2000, showed spondylitic changes at

C3-4, C4-5, and C5-6.  R. 194.  The C7-T1 level showed a small spondylitic bulge to the right without

canal stenosis.  The protrusions at C3-4 and C4-5 were smaller and did appear to touch the spinal cord.

*Id.*  Metts returned to Dr. Keller on January 5, 2001.  R. 193.  New radiographs showed some

degenerative disc disease at C7-T1.  Dr. Keller informed Metts that she would be a "reasonable

candidate" for an anterior cervical diskectomy C5-C6 with interbody fusion and anterior plating.  He

did not recommend the procedures for the C3-C4 and C4-C5 level.  Metts stated that she did not want

to have surgical treatment.  *Id.*

On February 6, 2001, Metts returned to Dr. Keller with complaints of neck and bilateral upper

extremity pain.  R. 192.  Dr. Keller reviewed an MRI scan and noted foraminal stenosis from HNP

C5-C6.  *Id.*  Dr. Keller, again, recommended anterior cervical diskectomy.  Metts was undecided, but

stated that she did not want to see Dr. Rojas any further for surgical care.  *Id.*  On February 23, 2001,

Metts visited Dr. Keller with the same complaints and agreed to his recommended procedure.  R. 189.

She underwent an anterior cervical diskectomy with decompression of the spinal cord and spinal nerve

root C5-6, anterior interbody fusion C5-6, structural bone graft C5-6, and anterior plating on February

28, 2001.  R. 151, 191.

Metts saw Dr. Keller on March 15, 2001 for a follow-up visit after her procedure. R. 183. Dr. Keller noted that "[o]verall she is doing well." *Id.* Dr. Keller further noted that Metts reported soreness in her neck, "but that is not that big a problem for her"; and reported dysphagia, "but that is improving nicely as well." *Id.* Metts also reported that her right upper extremity was "pain free." Metts continued to complain of left upper extremity pain, but Dr. Keller noted no neurological deficit in her upper extremity. New radiographs showed that the procedure was normal. *Id.* Dr. Keller continued Metts on her medication (Loratab and Soma), and "left her off work for a month." *Id.* Dr. Keller periodically renewed his recommendations that Metts stay "off work" from February 2001 to April 2001. R. 180, 182, 188, 190.

Metts returned to Dr. Keller on April 12, 2001, and stated that she had left shoulder pain but no upper extremity and hand pain after the surgery. R. 181. Radiographs showed that the graft and the plate from the surgery were "in good position[s]." *Id.* He stated Metts on physical therapy. *Id.* On May 24, 2001, Metts visited Dr. Keller again with complaints of neck pain and upper extremity aching. R. 179. She reported, however, feeling fifty percent better in her upper right extremity than she did prior to the surgery. *Id.* Radiographs taken during the visit showed that the graft was healing and the plate was in a good position. *Id.* Dr. Keller, again, recommended physical therapy; he also ordered a Functional Capacity Evaluation. *Id.*

Metts went to Healthsouth Merritt Island for the assessment of her physical and functional capabilities suggested by Dr. Keller. R. 163. In the Functional Capacity Evaluation dated June 20, 2001, the physical therapist opined that Metts could do sedentary work. *Id.* Testing showed that Metts could: lift fifteen pounds from floor to knuckle, knuckle to shoulder, and shoulder to overhead;

-23-

carry fifteen pounds for 100 feet with pivoting; and tolerate standing, bending, reaching, walking, stair climbing frequently, and sitting occasionally.  *Id.*  She tested at 4/5 for strength of her bilateral extremities. R. 165.  She had moderate pectoral minor bilateral restrictions, and decreased sensation on at C-6 and C-7.  *Id.*  Dr. Keller saw Metts on October 2001 and reviewed the Functional Capacity Evaluation. R. 174.  He agreed with the results.  *Id.*  A physical examination revealed that Metts was neurologically intact without any motor or sensory deficits.  *Id.*  Dr. Keller placed her at Maximum Medical Improvement with Permanent Partial Impairment, and told Metts that he had nothing further to offer her.  *Id.*

Metts visited Dr. Bloom on September 12, 2001.  R. 224.  Dr. Bloom's impression was of diffuse axial skeletal arthralgia (joint pain), myofascial pain, and depression.  *Id.*  Metts recommended a psychiatric interview and antidepressants.  *Id.*  On October 1, 2001, Dr. Miguel Rivera Rivera completed a psychiatric evaluation upon referral from Dr. Bloom.  R. 264.  Dr. Rivera assessed Depression, and prescribed Effexor, an anti-depressant. R. 265.  He also recommended "vocational rehabilitation/retraining."  *Id.*  Dr. Rivera observed that other than Metts' depressed mood, her mental status was normal. R. 264.  Her speech was coherent, and her thought and memory were normal.  *Id.* Dr. Bloom saw Metts in November 2001, and reported similar findings as his earlier notes.  His impression was that Metts had  "situational depression."  R. 222.

Metts returned to Dr. Miguel Rivera Rivera on November 6, 2001.  R. 262.  She was tearful and complained of stress.  *Id.*  She reported that her response to taking her prescribed dosage of Effexor had been "marginal."  *Id.*  Dr. Rivera observed a depressed mood, but noted that her mental status was otherwise normal.  *Id.*  Metts was also awake and alert with normal attention span and

memory.  *Id.*  Dr. Rivera increased her dosage of Effexor and prescribed Vioxx (a non-steroidal anti-inflammatory drug for pain).  *Id.*  He also recommended counseling and vocational re-training.  *Id.*  Dr. Bloom's progress notes from December 2001 indicate that he recommended physical therapy for general range of motion and stretching exercises, cervical epidural blocks, and medication.  R. 221.  Metts received epidural blocks on December 20 and 27, 2001 and January 3, 2002.  R. 211-20.

On December 26, 2001, Metts filed a claim for disability insurance benefits and supplemental security income benefits, claiming disability as of October 6, 2000 due to pain in her neck, back, shoulders, arms, and right hip, weakness in both arms, numbness in her hands, and depression.  R. 59.  Metts saw Dr. Bloom on January 16, 2002 and reported that she continued to feel "miserable."  R. 295.  She reported that the cervical epidural blocks did not help.  Dr. Bloom assessed: cervicalgia (neck pain), "intermittent" cervical radiculitis (inflammation or irritation of the root of a spinal nerve), "significant psychosocial stressors," and "no improvement with conservative therapy."  *Id.*  He noted that Metts was alert and cooperative, observed "no signs of cognitive deficits," but stated that Metts "seemed to be depressed."  *Id.*  Dr. Bloom's physical examination revealed limited range of motion of her cervical spine with tenderness.  He also found weakness in Mett's upper extremities, but stated that the weakness was "secondary to poor effort."  *Id.*  Dr. Bloom recommended seeking a "second opinion," physical therapy, return to the care of her other doctors, but had no further recommendations for Metts.  *Id.*

On January 25, 2002, a state agency physician opined as to Metts' RFC.  R. 238.  The physician opined that Metts could: lift and carry twenty pounds occasionally and ten pounds frequently; stand, walk, and sit for six hours in an eight-hour workday; and push and pull without

limitation.  R. 239.  Metts had no visual, communicative, or environmental limitations.  R. 241-42.

She had occasional limitations with climbing and balancing, and "limited" ability to reach in all

directions.  R. 240-41.

On February 10, 2002, a state agency psychologist opined as to Metts' mental functional

limitations.  R. 246-59.  The psychologist found that Metts had Reactive or Situational Depression,

but that her impairments were not severe.  R. 246, 249.  She had no restriction of activities of daily

living; no difficulties maintaining concentration, persistence, or pace; and no episodes of

decompensation.  R. 256.  Metts had "mild" difficulties maintaining social functioning.  R. 256.  The

psychologist stated: "Although we do not have evidence that her depressive symptoms have

completely resolved [by taking anti-depressants], there is no allegation in the . . . reports that [Metts']

functioning is limited in any way by serious symptoms of depression."  R. 259.

Metts visited Dr. Miguel Rivera Rivera on February 5, 2002, and reported that her medication

for depression (Effexor) was "somewhat helpful."  R. 261.  The doctor observed that Metts was no

in acute distress or discomfort, although Metts reported having increasing problems with her neck.

*Id.*  Metts' speech, thought, behavior, attention span, and memory were all normal.  *Id.*  The doctor

noted that her mental status was normal, except that she exhibited "definite undertones of depression."

*Id.*  On May 13, 2002, Metts returned to Dr. Rivera.  R. 260.  Metts again reported that her Effexor

medication "has been adequate and has helped her to handle her daily stress."  *Id.*  Dr. Rivera observed

that Metts was awake, alert, and oriented to person, place, date, time, and surroundings.  *Id.*  He stated

that her speech, attention span, and memory were normal, and although her mood was "obviously

depressed," he reported that Metts was normal in thought, behavior, judgment, and insight.  *Id.*  He recommended that she continue on her medication.  *Id.*

Metts saw Dr. Nicholas S. Potochny on May 21, 2002 upon referral from Dr. Keller.  R. 184.  Dr. Potochny conducted a physical examination and assessed neck and right-arm pain with "tremor-like activity" and a history of C5-6 fusion and anterior plate; he ruled out radiculomyelopathy.  R. 185.  Metts' range of motion to her spine and extremities showed some restriction.  *Id.*  Muscle strength testing was equivocal "due to tremor and cooperation."  *Id.*  Dr. Potochny also noted that Metts appeared depressed and tearful.  *Id.*  The doctor also completed an electrodiagnostic consultation, including conducting electromyographies (EMG) and nerve conduction studies (NCS's).  His impression was that Metts had mild right carpal tunnel syndrome and "interesting tremor-like activity," but noted that there were discrepancies with her tremors and his further observation of Metts during the visit.  R. 187.

On May 31, 2002, Metts returned to Dr. Keller for a follow-up appointment.  R. 296.  Dr. Keller reviewed the Dr. Potochny's EMG and NCS, and also found no evidence of radiculopathy.  Dr. Keller noted Dr. Potochny found discrepancies between Metts's tremors and what he observed of her during her visit, and interpreted the discrepancies as "some type of symptom amplification type (sic) behavior."  *Id.*  Dr. Keller agreed that "there is some symptom modification and amplification going on here."  *Id.*  Dr. Keller informed Metts that he could do nothing further for her, noting that she had healed from her February 2001 procedure.  *Id.*  He gave Metts "an impairment rating" of nine percent, and stated that he would not change his opinion that she could return to work with certain restrictions (as previously stated).  *Id.*; *see also* R. 197.

A state agency physician completed another assessment of Metts' RFC on June 10, 2002.  R. 266-74.  The physician opined that Metts could: lift and carry ten pounds occasionally and frequently; stand, walk, and sit for six hours in an eight-hour workday; and push or pull without limitation.  R. 267.  The physician found no postural, manipulative, visual, communicative, or environmental limitations. R. 268-70.  Another psychiatric review by a state agency psychologist on June 22, 2002, also showed that Metts had a depressive disorder that was not severe.  R. 274, 277.  The psychologist opined that Metts had mild: restrictions of activities of daily living, difficulties maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace.  R. 284.  Metts had no episodes of decompensation.  *Id.*

On August 7, 2002, Dr. Anthony Lombardo saw Metts, stating that he last saw her in 1998 following her injury at K-mart.  R. 302.  Dr. Lombardo noted that Metts had had neck surgery with Dr. Keller and "seemed to be doing fairly well."  *Id.*  Metts had "no complaints" of shoulder pain, but she reported having low back and right leg pain.  *Id.*  Dr. Lombardo noted that Metts walked with a limp, and had upper-body tremors on her right side.  *Id.*  Dr. Lombardo's physical examination revealed that Metts could bend forward thirty degrees and walk heel-to-toe.  A straight leg raise test was negative, but lateral bending was painful.  *Id.*  Dr. Lombardo noted that Metts had right hip bursitis.  X-rays showed that Metts had some arthritis in her back and narrowing in the L5-S1 region.  Dr. Lombardo gave her an injection for her bursitis.  *Id.*  On September 3, 2002, Dr. Lombardo recommended physical therapy, including aquatic exercises for weight loss and back pain.  R. 301.

Metts went to a "re-employment assessment" at Counseling and Rehabilitation Associates in on August 28, 2002.  R. 342.  She reported that her medications, cold packs, heating pads, physical therapy exercises, and doing leg exercises in a pool relieved some of her pain.  R. 247.  She also stated that she could:  lift five pounds; sit for thirty minutes at a time; stand and walk for fifteen minutes at a time; kneel (although she found it difficult to get up from kneeling); stoop and squat (but it caused discomfort in her legs); and balance without limitation.  *Id.*  Bending and twisting were limited; overhead reaching was difficult; and side and front-reaching with her right arm were painful.  *Id.*  She also stated that she could drive no longer than thirty minutes at one time.  R. 348.  She could bathe by herself and attend to her own personal hygiene and dressing needs.  *Id.*  She reported being able to hand her housework, but performed these activities intermittently with breaks.  *Id.*  She was able to make basic meals, but could not be at the stove for a long time.  *Id.*  She did not do yard work, but she did her own laundry.  *Id.*  Her other daily activities included helping her three year-old son get dressed and ready for daycare, going to thrift stores to shop, straightening her home, and napping.  *Id.*  She also reported smoking one pack of cigarettes a day.  *Id.*

The assessment described her as having average general learning ability, average verbal and numerical skills, low spatial perception, high motor coordination, average finger and manual dexterity, and low eye-hand-foot coordination.  R. 350.  Her interviewer observed tremors (which ranged from mild to severe) in Metts' right hand during her visit.  R. 353.  The interviewer noted that Metts presented "quite poorly," and stated that she "would have to demonstrate motivation to overcome some of her limitations in order to be successful."  *Id.*

-29-

On January 7, 2003, Metts went to Cape Canaveral Hospital with complaints of neck, upper and lower back, and right hip pain or "aches." R. 336, 340. Metts received cervical and epidural steroid injections and was discharged. R. 335. The hospital's patient assessment form indicates that she was alert and in "fair" physical condition. R. 336. Her mobility was "slightly limited." *Id.*

In January 2003, Metts began receiving treatment at the Space Coast Pain Institute with Dr. Golovac. On January 7, 2003, Dr. Golovac diagnosed cervicalgia, right hip pain, complex neuralgia, lumbar neuritis, and lumbar disc disease. R. 332-33. He noted that she was depressed, but stated that she was oriented to time, place, and person. R. 333. In upper extremity strength testing, Metts tested at 5/5 on the left and 4/5 on the right. *Id.* She was also able to walk toe-to-heel. R. 332. Dr. Golovac recommended epidural steroid injections, which she received on January 15, 2003, February 10, 2003 R. 329, 325.

Dr. Golovac saw Metts in February and April 2003, and Metts continued to have complaints of pain. R. 322-23. On May 19, 2003, Dr. Golovac conducted a discogram to determine the cause of Metts' back pain. R. 320. Dr. Golovac determined that Metts's "particular type of pain is easily treated with a percutaneous treatment called a Nucleoplasty." R. 319. He also noted that the treatment "should alleviate a major part of her pain." *Id.* Dr. Golovac performed the nucleoplasty procedure ("dekompressor") at L 4-5 on June 9, 2003. R. 314. The following day, Dr. Golovac noted that Metts was "doing well." R. 315. He assessed right arm pain, mid-thoracic and lumbar myalgia, and recommended aqua therapy for four to six weeks. *Id.* Metts returned on July 15, 2003 after completing aqua therapy. R. 314. During the visit, Dr. Golovac observed that Metts had her eyes closed and had right hand tremors. *Id.* He recommended that she continue aqua therapy. *Id.*

-30-

Metts saw Dr. Golovac on August 12, 2003, and reported that her back was "improved [by] 70%" as a result of the nucleoplasty.  R. 313.  Metts complained of right neck and arm pain.  *Id.*  Dr. Golovac recommended cervical facet injections, more aqua therapy, and continuation of her medication.  *Id.*  Metts received cervical facet injections on August 20, 2003 and responded favorably. R. 310-11.  She also underwent a cervical radiofrequency neurotomy approximately a week later.  R. 310.

On September 11, 2003, Metts visited Dr. Golovac, and reported that she experienced improvement by thirty percent of her cervical pain.  R. 305.  She still complained of neck pain.  *Id.* He assessed neck and lumbar pain, and recommended "aqua conditioning."  *Id.*  On October 22, 2003, Metts saw Dr. Stanley Golovac again.  R. 304.  Dr. Golovac's notes state that Metts "neurologic[ally]" was "much improved."  *Id.*  He also noted that she had no abnormal thought processes or suicidal ideation.  *Id.*  Both Metts and he assessed that she had improved by fifty percent in terms of her complaints of pain.  *Id.*  Metts, however, still complained of right arm and shoulder pain, so at the request of Dr. Golovac, an MRI of Metts' right shoulder was taken on October 31, 2003.  R. 303.  In report on the MRI dated November 1, 2003, the reading radiologist noted "some" degenerative changes within the acromioclavicular joint (AC joint) with minimal impingement, and a small amount of fluid within the subacromial-subdeltoid bursa (which the radiologist stated was likely "just . . . bursitis.").  *Id.*  The radiologist noted no evidence of full thickness tear.  *Id.*

Dr. Golovac completed a Physical Capacities Evaluation for Metts on January 22, 2004.  R. 357.  In the checklist form, he opined that Metts could: lift and carry five pounds occasionally; bend, squat, crawl, climb, and reach occasionally; use her hands for repetitive action, including simply

-31-

grasping, pushing and pulling, and fine manipulation; use her feet for repetitive movements involving pushing and pulling of her legs; sit for three hours in an eight-hour workday; and stand and walk for one hour in an eight-hour workday. *Id.* He did not opine as to her total ability to sit, stand, or walk at one time, and he stated that Metts had no environmental restrictions, such as "driving automotive equipment" and "being around moving machinery." *Id.*

On January 26, 2004, Metts testified at the hearing before the ALJ that she had pain in her upper back, shoulder blades, down in her neck, and all the way down her right arm. R. 369. She complained of having difficulty gripping and picking things up with her right hand. R. 370. She testified she can walk or stand for, at most, fifteen minutes. R. 371. Metts stated that she could sit in her recliner (with the heat and vibrator on) for maybe an hour, but that she could not sit for an hour in a chair similar to the one at the hearing. *Id.* She testified that she could lift up to five pounds, but could not hold it for any length of time. R. 372. Metts was not seeing a psychiatrist or psychologist at the time, and she reported taking Effexor for her depression. R. 368. She testified that the Effexor helped her depression. *Id.* Metts also testified that heat and the recliner with the massager makes her pain feel better "to some extent." R. 378.

Metts testified that after driving her son to Head Start every morning, she returns home and "maybe" tries to make the bed. R. 372. Her son dresses himself. *Id.* Metts also stated that she did "light cooking," and did two loads of laundry a week in a washer and dryer. R. 372-73. Metts testified that she goes shopping for groceries almost every day with her husband and son, but that she is not in the store for more than ten minutes. R. 373. She washes dishes but does not do them all at once because she cannot stand in one spot for too long. R. 373-74. She also testified that she sweeps

and mops once every two weeks, with the mopping being "an all-day process." R. 374. On February 24, 2004, the ALJ issued a decision that Metts was not disabled and not entitled to benefits. R. 31-32.

**B.     THE ANALYSIS**

Metts argues that the ALJ's decision is not based on substantial evidence. Docket No. 13 at 6. First, Metts contends that the ALJ erred in finding that Metts could perform the full range of sedentary work. *Id.* at 6-9. Second, Metts argues that the Commissioner erred by failing to assign controlling weight to Dr. Golovac's opinions. *Id.* at 9-14.

1.     The ALJ's Findings Were Supported Substantial Evidence

Following a thorough and extremely detailed review of the medical and other record evidence (R. 24-29), the ALJ found that Metts could not perform her past relevant work as a department manager, service desk clerk, and pantry manager at K-Mart (R. 29, 31, Finding 7). The ALJ found that Metts nevertheless retained the residual functional capacity ["RFC"] to perform substantially all of the full range[3] of the physical exertional requirements of sedentary work. R. 31, Finding 11. The ALJ found that Metts had occasional postural limitations, but could: lift ten pounds, stand and walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday. *Id.*, Finding 6. Applying the Medical-Vocational Guidelines, the ALJ concluded that Metts was not disabled. R. 32, Finding 12.

Metts claims that the she was unable to perform the full range of sedentary work, and therefore, the ALJ erred in using the grids to direct a conclusion of not disabled. Docket No. 13 at 9. The Commissioner counters that because the ALJ correctly determined that Metts could perform

---

[3]The "full range or work" is defined as "all or substantially all occupations existing at an exertional level." SSR 83-10.

substantially all of the full range of sedentary work, application of the grids was correct.  Docket No. 16-1 at 5-8.  The Commissioner is correct.  Substantial evidence supports the ALJ's findings, including the determination that Metts could perform substantially all of the full range of sedentary work and that the grids direct a finding that Metts was not disabled.

First, the only support Metts provides for concluding that she cannot perform the full range of sedentary work is Dr. Golovac's physical capacity evaluation (*see* Docket No. 13 at 7-9) which stated that she could lift only five pounds occasionally and sit for only three hours and stand or walk for one hour in an eight-hour work day (R. 357).[4]  The ALJ properly discounted Dr. Golovac's opinion in light of other contradictory evidence in the record.  Dr. Golovac's own treatment notes note that Metts showed significant improvement during her various visits.  *See* R. 304, 313, 315.  Further, the other medical source opinions and treatment notes support the ALJ's conclusions.  Both Dr. Bloom and Dr. Rojas initially treated Metts conservatively with medication, physical therapy, and epidural blocks.  R. 134-38, 225-36.  Dr. Bloom did recommend neck surgery (which Metts underwent with Dr. Keller), but Dr. Keller's notes indicate that the surgery was successful.  R. 181-91, 225.  Dr. Lombardo agreed that Metts "seemed to be doing fairly well" after her neck surgery.  R. 302.  He also recommended conservative treatment in the form of aquatic exercises for weight loss and back pain.  R. 301.

Dr. Potochny, like Dr. Lombardo, did not note any serious physical impairments.  R. 185-87.  The notes from Metts' visit to Cape Canaveral Hospital (dated January 7, 2003) indicate that Metts'

---

[4]Sedentary work involve lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  SSR 83-10.  Sitting in a sedentary job would generally total about six hours in an eight-hour workday.  SSR 96-9p.

mobility was only "slightly limited."  R. 336.  Three doctors (and one physical therapist) opined that

Metts was physically capable of performing sedentary work.  Dr. Keller, a treating physician, agreed

with the physical therapists' conclusion that Metts could perform sedentary work.  R. 174.  Two state

agency physicians concluded that Metts could perform more than sedentary work, by opining that

Metts could stand and walk for six hours in an eight-hour work day.[5]  R. 239, 267.  The ALJ correctly

disagreed with the state agency physicians that Metts could perform more than sedentary work, and

correctly agreed with Dr. Keller that Metts was capable of sedentary work.  R. 29.  The ALJ also

correctly noted that Metts' occasional postural limitations and occasional pushing and pulling

limitations do not erode Metts' vocational base of sedentary work.[6]  *Id.*

In addition, substantial evidence supports the ALJ's decision that Metts could perform the

mental requirements of sedentary work.  Nothing in the record indicates that Metts had any mental

limitations (i.e., limitations in her ability to understand and carry out instructions; to respond

appropriately to supervision, coworkers, and work situations; and to deal with changes in a routine

work setting) that would affect her ability to perform sedentary work.  Metts testified that taking

Effexor helped her depression.  R. 368.  The ALJ correctly concluded that Metts' mental impairments

were not severe.  R. 27-28.  The ALJ also correctly noted that Metts's daily activities are inconsistent

with Metts's allegations of disabling pain or other disabling limitations.  R. 29.  Thus, substantial

evidence supports the ALJ's determination of Metts's ability to work.  As the ALJ properly

---

[5]The full range of sedentary work requires the ability to stand and walk for approximately two hours during an eight-hour workday.  If an individual can stand and walk for a total of "slightly less" than two hours in an eight-hour work day, this limitation alone will not significantly erode the occupational base.  SSR 96-9p.

[6]Postural limitations (such as climbing, balancing, kneeling, crouching, or crawling) do not usually erode e the occupational base for a full range of unskilled sedentary work.  SSR 96-9p.  Further, limitations on the ability to push or pull will generally have little effect on the sedentary occupational base.  *Id.*

determined that Metts could perform substantially all of the full range of sedentary work, the ALJ was correct in using the grids to direct a finding of non-disability.[7]

### 2.   The ALJ Properly Discounted Dr. Golovac's Opinion

Metts also contends that the ALJ erred by failing to assign controlling weight to Dr. Golovac's opinion that Metts could not perform sedentary work. Docket No. 13 at 9. The Commissioner counters that the ALJ properly discounted Dr. Golovac's opinion. Docket No. 16-1 at 8. The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory, and in fact, the ALJ may reject *any* medical opinion if the evidence supports a contrary finding. As discussed earlier, substantial evidence (including the opinion of Dr. Keller, another treating physician)[8] supports the ALJ's finding that Metts could perform sedentary work. Both the ALJ and the Commissioner (in her memorandum) correctly state that Dr. Golovac's opinion is not supported by his own treatment notes or the other evidence in the record. R. 28; Docket No. 16-1 at 10. Further, the Commissioner also notes that Dr. Golovac's functional capacity evaluation was on a checklist-type form which contained no explanation of his

---

[7]Metts only argues that Dr. Golovac's physical capacity evaluation showed that Metts had physical limitations that compromised her ability to perform the full range of sedentary work. Docket No. 13 at 7-9. While Metts did not make any specific arguments as to the necessity of calling a VE, Metts does state generally that "[s]ince Metts' capacity for sedentary work is significantly reduced according to her treating physician, other medical evidence, and Ms. Metts' testimony, the ALJ erred in using the [grids]." *Id.* at 9. The Commissioner responds by arguing that VE testimony was required only when the claimant's exertional impairments prevent the claimant from performing a full range of employment. The Commissioner is correct. Exclusive reliance on the grids is not appropriate where the claimant is unable to perform a full range (or substantially all of the full range) of work at a given residual functional level, or where the claimant has a non-exertional impairment that significantly limits basic work skills. In this case, the ALJ properly concluded that Metts could perform substantially all of the full range of sedentary work and that Metts' non-exertional impairments (her allegations of pain and depression) did not significantly limit her basic work skills. *See* R. 28-29.

[8]Metts briefly argues that Dr. Keller was not a treating physician because "[a]lthough Dr. Keller was the surgeon who operated on . . . Metts in February 2001, he had not seen her since May 31, 2002." Docket No. 13 at 9. This argument is completely without merit and is directly contradicted by the record.

opinions.  R. 357; *see also* Docket No. 16-1 at 8.  The Court agrees.  Substantial evidence supports

the ALJ's decision, and remand is unnecessary.

## VI.     **CONCLUSION**

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.  The Clerk

should enter a judgment and close the case.

**DONE AND ORDERED** this 6th day of March, 2005.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL               33602

The Honorable Franklin D. Holder
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL             32817